UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| WILLIAM SMITH,<br><br>Plaintiff,<br>v.<br><br>THE SALVATION ARMY,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. 3:13-CV-505 WCL-CAN |

**BRIEF IN SUPPORT OF**
**THE SALVATION ARMY'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff William Smith ("Plaintiff" or "Smith") lost his job at The Salvation Army Adult Rehabilitation Center ("ARC") in January of 2013 after he became loud, angry, and defensive in connection with a work performance evaluation. Despite his uncorroborated assertions to the contrary, Mr. Smith's discharge had nothing to do with his age (63 at the time), his alleged perceived disabilities, or his religion, and thus, this case is ripe for summary judgment.

As the undisputed material facts show, Plaintiff Smith threatened his second-level supervisor; Smith's behavior escalated; and eventually, Major Nelson De La Vergne ("Major D") the Administrator in charge of ARC and an Officer of The Salvation Army, made the decision to end Smith's employment. Smith's conduct is well-document by all four individuals involved, and has been consistently described in the witnesses' testimony. It is further consistent with Smith's prior disciplinary documents, which also describe Smith's propensity for angry outbursts.

Smith insists his performance was "great," and denies any misconduct on the day he was discharged. Smith accuses The Salvation Army of firing him because he refused to sign an evaluation that allegedly referenced Smith's age, stated he could not do his job because of his

disability, and said he did not believe in God. Smith, however, cannot even describe what this mystery document looks like, let alone produce it. Moreover, no witness statement or testimony (other than Smith's) corroborates its existence—a fact which is unsurprising given the absurd nature of its alleged contents. Nevertheless, the mystery document, even had it existed, had no influence on Major D's decision to discharge Smith. Major D never saw or considered *any* evaluation in making the termination decision; rather, he fired Smith for his outburst on January 3, 2013, combined with Major D's personal knowledge of Smith's performance history. Smith's uncorroborated story is fanciful at best, and is insufficient under federal summary judgment standards to create a genuine issue of material fact. Accordingly, The Salvation Army requests this Court grant summary judgment as to all Smith's claims.

## I. SUMMARY OF KEY FACTS

### A. The Salvation Army and Mr. Smith

The Salvation Army operates an adult residential rehabilitation center (ARC) and thrift store in South Bend, Indiana. (Deposition of William Smith and Relevant Deposition Exhibits (**Exhibit A**) p. 41; Deposition of Major Nelson (**Exhibit B**) p. 4). Smith had been a beneficiary (*i.e.*, a participant) in the rehabilitation program at the ARC, and in November of 2007, The Salvation Army hired Smith to sort donated clothes to be sold at the thrift store. (Pl's Dep. p. 25-26, 41; Affidavit of Louis Lightfoot (**Exhibit C**) ¶ 3). As an employee, he reported to the sorting room supervisor, Billy Malone. (Pl's Dep. p. 26-27; Deposition of Billy Malone (**Exhibit D**) p. 5; Lightfoot Aff. ¶ 3). Smith's second-level supervisor was Louis Lightfoot, Director of Operations (Major D Dep. p. 34-35); Major Nelson De La Vergne ("Major D") was the ARC Administrator. (Major D Dep. p. 4, 34).

### B. Smith's Discipline and Negative Attitude at the ARC

As Smith's employment progressed, he developed an increasingly negative attitude. (Malone Dep. p. 19-21; Lightfoot Aff. ¶ 5). Smith's behavior became unpredictable—some days were good, and others were not. (Malone Dep. p. 19-21). On bad days, Smith would be angry and suddenly go into a rage, using profanity and accusing others of wrongdoing. (Malone Dep. p. 19-21). At his deposition in this lawsuit, Malone wrote a description of Smith's profanity, explaining that Smith used this language (or similar language using different words) "repetitive[ly]." (Malone Dep. p. 22-25, Malone Dep. Ex. 1). According to Malone, Smith stated, "These fuckin hunkies don't give a damn about you. They using God to get shit. And when they finish you nigga they gonna fire u." (Malone Dep. p. 22-25, Malone Dep. Ex. 1). Despite this, Smith represents that his performance was "great." (Pl's Dep. p. 44).

Smith's attitude prompted various disciplinary actions. On January 20, 2011 Lightfoot met with Smith to discuss problems with pricing the clothing in the thrift shop. (Affidavit of Captain Schaal (**Exhibit E**) ¶ ; Lightfoot Aff. ¶ ; January 20, 2011 Memo (**Exhibit F**)). Smith became upset and loud, claiming it was someone else's fault. (Pl's Dep. p. 44-45, [57-58?]; Lightfoot Aff. ¶ 7; Ex. F). Smith asserts this discipline is part of The Salvation Army's "intimidat[ion]" of him, but admits he does not know why it was issued, or if was issued because of his age, religious beliefs, or a health condition he had. (Pl's Dep. p. 61-62).

On July 10, 2012, Smith was counseled again. (Pl's Dep. p. 82-83, Pl's Dep. Ex. 5; Captain Schaal Aff. ¶ 8). Major D, Malone, Kevin Landry (a supervisor), Roxann Wyatt (Human Resources Coordinator), and Smith all attended a meeting during which Malone discussed three of Smith's performance issues. (Pl's Dep. p. 66-67, Pl's Dep. Ex. 5; Captain Schaal Aff. ¶ 8). First, Malone explained that he heard Smith tell beneficiaries that the ARC could not do anything for them and they should go to the Homeless Center and get a job with

Catholic Charities. (Pl's Dep. p. 66-67, Pl's Dep. Ex. 5; Captain Schaal Aff. ¶ 8). Second, Malone explained that Smith would get extremely defensive when presented with corrective feedback and further became aggressive to others, including his supervisor. (Pl's Dep. p. 66-67, Pl's Dep. Ex. 5; Captain Schaal Aff. ¶ 8). Third, Malone explained that Smith did not communicate effectively and was not a team player. (Pl's Dep. p. 66-67, Pl's Dep. Ex. 5; Captain Schaal Aff. ¶ 8). Unintentionally proving Malone's point, again, Smith became upset, loud, and defensive during the meeting. Malone warned Smith he needed to improve immediately or he would be subject to further discipline, including termination. (Pl's Dep. p. 66-67, Pl's Dep. Ex. 5; Captain Schaal Aff. ¶ 8).

Smith characterizes this July 2012 disciplinary meeting as discrimination and harassment, although he admits he does not know or "can't say" whether the discipline was motivated by Smith's age, religious beliefs, or any disability, including drug use. (Pl's Dep. p. 85-87).

A few months later, on October 5, 2012, Smith received a verbal warning after he took oranges out of the dining hall. (Captain Schaal Aff. ¶ 9; October 5, 2012 Documented Verbal Warning (**Exhibit G**)). ARC's rule was (and still is) that although employees can eat for free while working, food may not be taken out of the dining hall, and several people had been warned about violating this policy. (Major D. Dep. p. 120-22; Captain Schaal Aff. ¶ 9). For his part, Smith characterizes this verbal warning as "one element of harassment," (Pl's Dep. p. 211), but Smith admits that he took his food from the dining hall (*i.e.*, a violation of the rule) while others ate the food in the dining hall. (Pl's Dep. p. 157).

Meanwhile, Smith's negativity grew more and more apparent. (Malone Dep. p. 111, 115-16, Malone Dep. Ex. D). Smith talked to Malone about retiring, saying he was going to quit because he couldn't "take it no more." (Pl's Dep. p. 88; Malone Dep. p. 111, 115-16, Malone

Dep. Ex. D). At various times, Smith said he wanted to make it to five years of employment so he could receive a retirement benefit. (Pl's Dep. pp. 89, 125). Yet, even after his five-year anniversary, Smith did not retire—he continued to work. (Pl's Dep. p. 125). His performance problems also continued.

**C. Drug Testing**

Everyone, including Smith, who enters The Salvation Army's ARC is tested for alcohol. (Major D. Dep. p. 26; Lightfoot Aff. ¶ 10; Pl's Dep. p. 127-28). On occasion, employees and beneficiaries are also asked to submit to additional urine drug tests. (Lightfoot Aff. ¶ 10). These tests are administered consistently with The Salvation Army ARC's practice, including the testing of Smith. (Lightfoot Aff. ¶ 10).

Still, Smith repeatedly contends he was drug-tested more often than "everybody else." (Pl's Dep. p. 131). He claims Lightfoot and Malone tested him [Smith] to try and catch him using drugs or alcohol at work. (Pl's Dep. 62-63, 135). When asked *how* Smith knows he was tested more frequently, Smith testified, "Because I just know." (Pl's Dep. p. 133). Smith, however, does not know. He was not in the room while anyone else was tested and has no access to The Salvation Army's drug-testing records. (Pl's Dep. 132-33). And, despite his protestations to the contrary, Smith was, in fact, only tested twice between June 27, 2011 (the most recent log book entry available) and his termination—on September 6, 2011 and December 10, 2012. (Lightfoot Aff. ¶¶ 11-12; Captain Schaal Aff. ¶¶ 10-11; Drug Testing Log Book (**Exhibit H**)). During this 17-month time period, a total of 19 employees were tested (including Smith); one was tested three times, five were tested twice (including Smith), and 13 were tested once. (Lightfoot Aff. ¶¶ 11-12; Captain Schaal Aff. ¶¶ 10-11; Ex. H). The ages of those employees who were tested range from 34 to 64 years old; the vast majority have no known disabilities (though several, including Smith, were previously beneficiaries in the program), and

no known religious affiliations. (Captain Schaal Aff. ¶ 11). Further, besides Smith, all of the employees who were tested twice were at least eight years younger than Smith. (Captain Schaal Aff. ¶ 11).

**D. Smith's Conduct Leading to his Separation**

On January 3, 2013, Malone approached Smith in the sorting room with Smith's performance evaluation in hand, and intended to talk with Smith about his performance issues. (Malone Dep. p. 101-03, Malone Dep. Ex. C; Pl's Dep. Ex. 7; Captain Schaal Aff. ¶ 12). Malone had prepared the evaluation himself (Malone Dep. p. 101-03, Malone Dep. Ex. C), and had not discussed the evaluation or the specifics of the evaluation with Major D. (Affidavit of Major D (**Exhibit I**) ¶ 9). Malone handed the evaluation (*only* the evaluation and not any other document) to Smith and asked if he would read and sign the evaluation. (Malone Dep. p. 106, 110). Smith declined, mumbled profanities, and Malone took the evaluation to Lightfoot. (Malone Dep. p. 106).

Then, Lightfoot asked Malone to bring Smith to his [Lightfoot's] office so that Lightfoot could help Smith understand the performance issues. (Lightfoot Aff. ¶¶ 13, 14; Lightfoot Statement (**Exhibit J**); Captain Schaal Aff. ¶ 13). When Smith arrived, Lightfoot asked Malone to return to the sorting room, which was located upstairs in the building. (Lightfoot Aff. ¶¶ 13, 14; Ex. J). Smith's voice grew louder and Smith cursed at Lightfoot, telling Lightfoot that Lightfoot just needed to "pop" more pills and leave him [Smith] alone. (Ex. J). Lightfoot attempted to calm Smith to no avail, so Lightfoot walked with Smith to the Human Resources office to talk with Roxann Wyatt. (Ex. J).

As they walked, Smith threatened Lightfoot, saying something to the effect of "I'll get you after work." (Ex. J). Smith's profanity, loud voice, and aggressive behavior continued in Wyatt's office. (Ex. J; Captain Schaal Aff. ¶ 14; Wyatt Statement (**Exhibit K**)). Smith did not

allow Lightfoot to discuss the evaluation, instead calling them racist, (Pl's Dep. p. 146), and stating "I know my job, why don't you all leave me alone and let me do my job." (Ex. K). Smith became louder and louder, yelled that this was "bullshit," and accused Lightfoot and Wyatt of being "fucking thieves." (Ex. J; Ex. K). Wyatt and Lightfoot again tried to calm Smith, but Smith refused. (Ex. J; Ex. K).

Worried that Smith's outburst could become violent, Lightfoot escorted Smith to The Salvation Army's locked foyer so he could discuss the matter with Major D, who—until this point—had been entirely removed from the situation. (Exs. J, K). Then, Major D went to the foyer to talk with Smith, but Smith remained loud, had an inappropriate tone, and was using profanity. (Major D. Dep. p. 9-10; Major D Aff. ¶ 6; Captain Schaal Aff. ¶ 15; Major D Statement (**Exhibit L**)). Major D decided to terminate Smith because of his past inappropriate behavior and Smith's outburst that day.[1] (Major D Dep. p. 8-9; Major D Aff. ¶ 7). Smith's behavior on January 3, 2013 violated The Salvation Army's Violence in the Workplace Policy and warranted termination under its Discipline Policies. (Major D Aff. ¶ 7; Pl's Dep. Ex. 6, p. 17, 52).

No one recommended to Major D that Smith be terminated. (Major D Aff. ¶ ; Lightfoot Aff. ¶ 8; Malone Dep. p. 13). Major D did *not* review any documents in making his decision—not the evaluation Malone presented to Smith or any other document. (Major D Dep. p. 61-62, Major D Aff. ¶ 15). Major D never even saw the evaluation Malone presented to Smith before he fired Smith; it had nothing to do with his decision. (Major D Aff. ¶ 9). After making the termination decision, Major D asked Lightfoot to communicate the decision (Major D Dep. p. 137; Ex. L), and Lightfoot went to the foyer and told Smith that he was terminated immediately.

[1] Smith does not know who made the decision to fire him, though he speculates Lightfoot made the decision because Lightfoot communicated the decision. (Pl's Dep. p. 147, 220, 223). In fact, Major D was the decisionmaker. (Major D Dep. p. 8).

(Lightfoot Aff. ¶ 16). Smith responded with more threats to Lightfoot, including words to the effect of, "I'll see you after work, you racist mother f*****. You'll get yours."[2] (Lightfoot Aff. ¶ 16).

For his part, Smith denies he ever received a copy of the evaluation Malone handed him on the day he was terminated. (Pl's Dep. p. 147). Instead, he claims he was fired because he refused to sign another evaluation-type document that allegedly stated he [Smith] did not believe in God and that he [Smith] had a disability. (Pl's Dep. p. 51-52, 84-85, 141, 151-52). Plaintiff also suggests his age may have been referenced in the document, (Pl's Dep. p. 84-85, 151-52), even though Smith's others descriptions of the document, including Smith's EEOC Charge, never mention any reference to his age. (Pl's Dep. pp. 141, 151, 171-72, Dep. Exs. 8, 11). In addition to Smith's inconsistent description of the mystery evaluation-type document, he cannot describe what the document looked like; he declined to say whether the document was handwritten or typewritten; he cannot say how many pages the document had; and he has not seen the document during the course of this lawsuit. (Pl's Dep. pp. 148, 153, 158).

> Q What did the document that you were given look like? Was it handwritten or typewritten? What did it look like?
>
> A This [Pl's Dep. Ex. 7/Malone Dep. Ex. C] is not the document. I know if you showed me one, I'll tell you if that's the document. That's not the document.
>
> Q Do you recall if it was typewritten or handwritten?
>
> A If you show me the document, I will tell you if that's it or not. This is not it.

Major D has never seen anything like what Smith describes and does not believe such a document even exists. (Major D Dep. p. 59, 62, 138; Major D Aff. ¶ 12). Similarly, Lightfoot has never seen or heard of any document of the type Smith describes (though he would be aware

[2] Asterisks are used for purposes of this brief only. Smith used the actual words.

of such a document given his role at The Salvation Army). (Lightfoot Aff. ¶ 17). Malone also has no idea what document Smith is describing. (Malone Dep. p. 35-36, 89, 93, 110).

### E. Smith's Claims

In the case before this Court, Smith asserts three types of discrimination/harassment claims: (1) religious discrimination in violation of Title VII and the South Bend Human Rights Ordinance; (2) disability discrimination and harassment in violation of the Americans with Disabilities Act and the South Bend Human Rights Ordinance; and (3) age discrimination in violation of the Age Discrimination in Employment Act.3 (Complaint, ¶¶ 15-18).

#### *1. Undisputed Facts Relevant to Smith's Religious Discrimination Claims*

Smith brings a religious discrimination claim because he alleges The Salvation Army gave him a document that stated he "didn't believe in God." (Pl's Dep. p. 112-13, 116). This allegedly happened only once—Smith was unable to describe any other occasion when someone questioned Smith's belief in God. (Pl's Dep. p. 118-20). In fact, Smith believes in a "higher power,"—which is terminology Smith claims The Salvation Army uses in "AA meetings." (Pl's Dep. p. 114-15). Smith was not required to go to The Salvation Army's church and he did not feel like he had to say a prayer at work. (Pl's Dep. p. 117-18). "It didn't bother me saying the prayer." (Pl's Dep. p. 118). Smith further acknowledges that at least one other employee did not say a prayer at work. (Pl's Dep. p. 118). There is nothing about Mr. Smith's belief in a higher power that contradicts or runs contrary to The Salvation Army's purpose. (Pl's Dep. p. 115). Moreover, Major D, the decision-maker in this case, was not aware of what church Smith belonged to. (Major D Dep. p. 27-28).

---

[3] Smith raises separate claims of disability and religious employment discrimination under federal and local law, but only one analysis is needed for each because the South Bend Human Rights Ordinance provides the same rights and protections as Indiana state law and federal law. *See Patterson v. Indiana Newspapers, Inc.*, No. 1:05-CV-881LJMWTL, 2008 WL 833466 at *10, n. 4 (*citing Ind. Civil Rights Comm'n v. S. Ind. Gas & Elec. Co.*, 648 N.E.2d 674, 680-81 (Ind. Ct. App. 1995)); South Bend Municipal Code, Article 9, Section 2-126 *et seq.*

2. *Undisputed Facts Relevant to Smith's Disability Discrimination Claims*

Smith states he is not disabled. (Pl's Dep. p. 170-71). "This complaint is not on the basis that I am disabled because I am not. This is the premise of them firing me. They stated I was disabled and wanted me to sign a statement to that fact, and I refused." (Pl's Dep. p. 169, Pl's Dep. Ex. 11). Although he believes the document referenced some disability, Smith has no idea what disability The Salvation Army believed he had. (Pl's Dep. p. 170). Prior to receiving the alleged paper on the day he was fired, no one had ever told Smith he was disabled or accused him of not being able to do his job physically. (Pl's Dep. p. 170). Smith alleges Malone and Lightfoot perceived him to be a current user of illegal drugs, but not Major D. (Pl's Dep. p. 62-63, 135). Smith identifies Malone and "Daniel" as two employees he [Smith] claims were visibly under the influence. (Pl's Dep. p. 137). Malone was subject to daily alcohol tests, and further was given a urine test at least once, (Lightfoot Aff. ¶ 18), and Smith admits "Daniel" was tested, failed the test, and was fired. (Pl's Dep. p. 49).

3. *Undisputed Facts Relevant to Smith's Age Discrimination Claim*

Smith (age 63 on January 3, 2013), claims the document he saw on that day made some reference to his age. (Pl's Dep. p. 84). But, Smith does not believe anything that The Salvation Army did while he was employed was motivated by Smith's age. (Pl's Dep. p. 85). He claims "They just didn't like me." (Pl's Dep. p. 85). Smith also claims there were "favorites" who were treated better than he, although that group consisted of younger and older people. (Pl's Dep. p. 179-81). Smith could recall only one name—"Bob," and Smith concedes Bob was an ARC supervisor. (Pl's Dep. p. 180-81).

Similarly, Smith claims "Landry" was treated more favorably, in general, than Smith because Landry got to fill in for Lightfoot when Lightfoot was out. (Pl's Dep. p. 55-56). Landry, however, was a supervisor, (Lightfoot Aff. ¶ 19) and Smith knows nothing about

Landry's religious beliefs or disability status. (Pl's Dep. p. 56). Smith cannot say whether the beneficiaries who also did Smith's job were younger or older than Smith. (Pl's Dep. p. 229-30).

### 4. *Undisputed Facts Relevant to Smith's Purported Race Discrimination Claim*

Smith testified that he intended to assert a race discrimination claim. (Pl's Dep. p. 159). Smith's Complaint does not reference any such claim; no race discrimination claim was asserted within 90 days of Smith receiving the right to sue notice issued relative to his claims. (See Complaint).[4]

### 5. *Undisputed Facts Relevant to Smith's Harassment Claims*

Smith claims Lightfoot harassed him by "giving [Smith] drug tests all the time," and by having a "nasty attitude." (Pl's Dep. p. 52-53). Smith contends Lightfoot had a "nasty attitude" toward "quite a few people," and explains Lightfoot's "arrogan[ce]" is the root of his attitude. (Pl's Dep. p. 53).

The Salvation Army has a complaint procedure in place to prevent and promptly correct any religious, disability, or age harassment. The complaint procedure is outlined in the employee handbook—a document Smith brought with him to his deposition. (Pl's Dep. p. 82, Pl's Dep. Ex. 6, p. 23-24; Major D Aff. ¶ 7). Nevertheless, Smith never used The Salvation Army's procedure to complain about being treated unfairly or being harassed—by Lightfoot or anyone else--because of his age, religion, or perceived disability. (Pl's Dep. p. 49-50, 68; Major D Dep. p. 157-58; Lightfoot Aff. ¶ 20; Malone Dep. p. 97-98).

---

[4] Because Smith has not asserted a race discrimination claim in his Complaint and because any such claim is time-barred, The Salvation Army does not address it in detail in this summary judgment brief. *See* 42 U.S.C. § 2000e-5(f)(1); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir.2002) (retaliation claim filed several days after the 90 day deadline expired was time-barred); *Jones v. Madison Service Corp.*, 744 F.2d 1309, 1314 (7th Cir.1984) (affirmed grant of summary judgment to defendant when plaintiff filed lawsuit on 92nd day).

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), motions for summary judgment "shall be rendered forthwith if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) (emphasis added). Since the Supreme Court's ruling in *Celotex Corp. v. Catrett*, summary judgment is mandatory when this standard is met. 477 U.S. 317, 322 (1986). To overcome a motion for summary judgment, the nonmoving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex*, 477 U.S. at 322–23; *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000). Where a factual record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted).

In this case, although the Plaintiff has attempted to confuse the facts with denials and reports of a mystery evaluation, his disputes are not *genuine* issues of *material* facts; moreover, based on the record, The Salvation Army is entitled to judgment as a matter of law.

## III. SMITH'S DISCRIMINATION CLAIMS FAIL

### A. Smith's Case Rests on Uncorroborated Evidence, Which Does Not Create a Genuine Issue of Material Fact

Smith's entire case relies almost entirely of his own description of the contents of a mystery document he claims he was given on the day he was fired—contents that are objectively absurd in light of The Salvation Army's core principles. Although, fundamentally, Smith's assertions about the mystery document violates the best evidence rule (Fed. R. Evid. 1002), no reasonable juror could conclude the document actually exists or that it says what Smith claims it does. Smith's description of the contents of the document vary—at time he alleges "age" was part of it, at other times, he omits age. He cannot produce the document, cannot describe the document, and has not seen the document during the course of this litigation. Similarly, The Salvation Army is not aware of any such document, has attempted (unsuccessfully) to obtain a copy and/or descriptions of the document, and tried (again unsuccessfully) to refresh Smith's recollection with other documents (including one that *does* exist and was presented to Smith by his supervisor on the day he was fired). No witness other than Smith and no other written paper corroborate the existence or the contents of the mystery document. In fact, the testimony and witness statements from the individuals who were there on Smith's last day of employment are consistent with the reasons for Smith's dismissal; that is, he was aggressive, defensive, loud and threatening.

The totality of the undisputed evidence underscores that Smith's insistence about the mystery document creates nothing more than what the U.S. Supreme Court has described as a "metaphysical doubt" as to the material facts. *Matsushita*, 475 U.S. at 586 (a non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts); *see also Reed v. Town of North Judson, Ind.*, 966 F.2d 1219 (7th Cir. 1993) (affirming summary

judgment where the plaintiff's story was unsupported by other evidence while the defendant officer's version of events was corroborated by evidence); *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (A genuine issue of fact "exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole.") At summary judgment, Smith is "only entitled to the benefit of all reasonable or justifiable inferences." *Rand v. CF Indus., Inc.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

Smith's uncorroborated story does *not* create a "genuine" issue of "material" fact. Fed. R. Civ. P. 56(a). Because no reasonable juror could believe his version of events, Smith's discrimination claims against The Salvation Army cannot survive summary judgment.

**B. Methods of Proof**

Smith must prove his disability, religious, and age discrimination claims under either the direct or indirect methods of proof. *Mullin v. Temco Mach., Inc.*, 732 F.3d 772, 776–77 (7th Cir.2013); *Cervantes v. Caterpillar Inc.*, No. 11 C 8185, 2013 WL 3224451, at *3 (N.D. Ill. June 25, 2013) (religious discrimination); *Warpenburg v. Target Corp.*, No. 106-CV-00829-RLY-TAB, 2007 WL 2993988, at *14 (S.D. Ind. Oct. 11, 2007) (disability discrimination); *Riley v. Boston Scientific Corp.*, No. 2:12-CV-340-WTL-WGH, 2014 WL 4656823, at *2-3 (S.D. Ind. Sept. 17, 2014) (age discrimination). The direct method can be proved through direct evidence or circumstantial evidence. *Id.*

> Direct evidence requires that the employer admit its discriminatory intent (e.g., the "smoking gun" case). The far more common case relies on circumstantial evidence, which allows the trier of fact to infer intentional discrimination by the decisionmaker. Circumstantial evidence typically includes (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor

> of a person outside the protected class and the employer's reason is a pretext for discrimination. Circumstantial evidence must point directly to a discriminatory reason for the employer's action. At bottom, as we have recently emphasized, a plaintiff seeking to survive summary judgment must produce enough evidence that a rational jury could conclude that the employer took the adverse action against the plaintiff because he is a member of a protected class.

*Id.* (internal citations and quotation marks omitted).

Under the indirect method of proof, Smith must offer evidence that: (1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) a similarly situated employee not in his protected class received more favorable treatment. *Brummett v. Sinclair Broad. Grp. Inc*., 414 F.3d 686, 692 (7th Cir.2005). Should Smith establish his prima facie case, the burden shifts to The Salvation Army to present a legitimate and non-discriminatory reason for the employment action. *Id.* On such a showing, the burden then shifts back to Smith to show that the employer's proffered reason is a pretext for discrimination. *Id.*

The undisputed facts demonstrate Smith cannot establish any of his discrimination claims under either method.

### C. Smith's Alleged Mystery Document Does Not Prove Intentional Discrimination under the Direct Method

Even if Smith's mystery document does exist (a fact that requires significant stretch of the imagination), it is does *not* prove Major D intentionally discriminated against Smith. *See Makowski v. SmithAmundsen LLC*, 662 F.3d 818 (7th Cir. 2011) ("direct evidence is evidence that would prove discriminatory intent without reliance on inference or presumption, and a plaintiff may also construct a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.") Major D never saw any evaluation document before he fired Smith and never discussed it with Smith's supervisors, Malone or

Lightfoot, before Smith saw the evaluation on January 3, 2013. The Salvation Army's Major D made the decision to fire Smith *independently*, without concern for (or even knowledge of) any evaluation, and without input from Malone or Lightfoot. He made that decision based on Smith's inappropriate and unprofessional outburst that day and on prior occasions—not because of what was written on any evaluation or Smith's refusal to sign it. *See Nichols v. Southern Ill. Univ.-Edwardsville*, 510 F.3d 722, 782 (7th Cir. 2007) (suggestion to police chief to assign officers in discriminatory manner not probative of intentional discrimination because individual lacked influence over final decision and there was no evidence that chief took that advice); *see also Gusewelle v. City of Wood River*, 374 F.3d 569, 574 (7th Cir. 2004) (direct evidence essentially requires admission by decision maker that his actions were based upon prohibited animus). Even if Smith's story about the alleged mystery document is taken as true, it is wholly unrelated to Major D's decision to terminate Smith's employment, and therefore *not* evidence of intentional discrimination.

### D. Smith Also Cannot Establish a *Prima Facie* Case of Discrimination Under the Indirect Method

#### *1. <u>Smith Was Not Meeting Legitimate Performance Expectations</u>*

All of Smith's discrimination claims—age, disability, religion-- fail because Smith cannot establish the fundamental element that he was meeting The Salvation Army's legitimate performance expectations. Apart from the events on the day of his separation, Smith had become negative, defensive, and unprofessional. He was counseled at least twice, but his negativity persisted and came to a head on the day Smith was fired. Smith was visibly angry, used profanity, got loud, and made threats—all of which violate The Salvation Army policies and warrant discipline up to and including discharge.

Smith's unsupported belief that his performance was "great" and that the discipline was unwarranted does not save his claim. *Haywood v. Lucent Technologies, Inc*., 323 F.3d 524, 531 (7th Cir. 2003) (employee's belief the negative performance evaluations were unwarranted was not enough to establish the element of a prima facie case of discrimination that she was meeting her employer's legitimate performance expectations). Because Smith cannot establish he was meeting The Salvation Army's legitimate performance expectations, the first element of his *prima facie* case, all of his discrimination claims fail.

2. *Smith Was Not Treated Less Favorably Than Similarly Situated Employees*

The second prong of Smith's indirect case against The Salvation Army also has no basis in fact. Smith makes general allegations about his sense of unfairness, but has failed to present any reliable evidence of similarly situated employees outside Smith's protected class who were treated more favorably than he. Smith mentions "Bob" and Kevin Landry—both of whom are supervisors and therefore not similarly situated. Moreover, Smith admits he does not know Bob's age and knows "nothing" about Landry. Smith further could only identify one employee whom he [Smith] observed to be under the influence of drugs or alcohol; as it turns out, that employee was drug-tested and fired.

In sum, Smith's vague allegations of individuals who were treated more favorably are insufficient. *Winsley v. Cook Cnty*, 563 F.3d 598, 605 (7th Cir. 2009) (holding no prima facie case established where the plaintiff identified an individual who "had some type of medical issue similar to [hers]," thought she provided no further evidence; "vague assertions alone do not establish that [the alleged similarly situated employee] was directly comparable to [the plaintiff] in all material respects.") Because Smith has failed to present evidence of any similarly situated

employee outside his protected class who was treated more favorably, he cannot establish a *prima facie* case, and again, all of his discrimination claims fail.

*3. <u>Smith's Drug Tests and Discipline Are Not Actionable</u>*

Although the heart of Smith's lawsuit is based on his firing, Smith also suggests the drug tests and discipline issued to him during the course of his employment at The Salvation Army were discriminatory. Smith is mistaken. Neither the drug tests he was obliged to take nor the discipline rise to the level of adverse employment actions. Even if they were, Smith cannot show the tests or the discipline stemmed from his protected characteristics of age, religion, or perceived disability.

To begin, "[E]mployer-ordered drug tests are considered adverse employment actions only if the test 'is not performed in a routine fashion following the regular and legitimate practices of the employer, but [rather] is conducted in a manner that harasses or humiliates.'" *Berry v. Arcelormittal USA LLC*, No. 2:10 CV 124, 2013 WL 1499154, at *4 (N.D. Ind. Apr. 10, 2013) (*citing Stockett v. Muncie Ind. Transit Sys*., 221 F.3d 997, 1001-02 (7th Cir.2000)). The Salvation Army ARC has a consistent practice for issuing drug tests—a practice that is applied consistently and without regard for protected status. Aside from his pure speculation, Smith offers no evidence to support or even suggest that The Salvation Army deviated from its practice in testing Smith or otherwise conducted the two tests in a harassing or humiliating manner. *See also Keys v. Foamex, L.P.*, 264 Fed. Appx. 507, 511 (7th Cir. 2008) (drug test was not adverse action where it was consistent with employer's policy). At The Salvation Army's ARC, other employees were tested under the same circumstances as Smith; and, the vast majority of those employees were younger than Smith, had no known disabilities, or any known religious beliefs. In short, because they were administered consistent with the ARC's policies, Smith's drug tests

are not adverse actions; moreover, even if they were, there is no evidence the tests were motivated by Smith's age, religion, or alleged disability.

Similarly, The Salvation Army's regular discipline of Smith does not constitute an adverse action. Smith was warned; there was no substantive change to the terms or conditions of Smith's employment. *Vawter v. Alcoa, Inc.*, 2008 WL 5220833, at *3 (N.D.Ind. Dec. 10, 2008). Oral or written reprimands and warnings do not rise to the level of an adverse employment action. *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir.2001). Even if they did, however, Smith presents no evidence that the discipline was issued because of his protected status. In fact, Smith admitted throughout his deposition in this case that Lightfoot just didn't "like" Smith. Smith never claimed Lightfoot's dislike was rooted in Smith's age, religion, or alleged disability.

Consequently, Smith's "kitchen-sink" approach to his lawsuit by throwing in allegations about allegedly unfair drug tests and discipline does not pass muster. Neither amounts to an adverse employment action or supports his claim discrimination based on any protected characteristic.

*4. <u>Smith's Disability Discrimination Claims Fail for Additional Reasons</u>*

On the sole subject of Smith's disability discrimination allegations against The Salvation Army, Smith's claims fail for the threshold reason that <u>Smith is not disabled</u>. *See Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012) ("Without evidence that Povey is disabled, Povey cannot survive summary judgment on her disparate treatment and failure to accommodate claims under the ADA.") Smith flatly denies he is disabled, instead arguing The Salvation Army "regarded him" as disabled, based on his speculation that The Salvation Army tested him more than other employees and thus, regarded him as a current drug user. But, Smith's speculation is not sufficient, and the records show Smith was tested twice--*not* more

than others. Smith's unfounded speculation to the contrary is insufficient to defeat summary judgment. *Winsley*, 563 F.3d at 605 (*citing Karazanos v. Navistar Intern. Transp. Corp*., 948 F.2d 332, 337 (7th Cir.1991) ("[A] plaintiff's speculation is not a sufficient defense to a summary judgment motion.") The ADA allows The Salvation Army to "administer reasonable policies or procedures, including but not limited to drug testing," designed to ensure that individuals like Smith, Malone, and Lightfoot (*i.e.*, those who successfully completed a drug rehabilitation program) are no longer engaging in illegal drug use. 42 U.S.C. § 12210(b).

Because Smith admits he was not disabled and because he presents *no* evidence (aside from his own speculation) that The Salvation Army regarded him as a current drug user, Smith's disability discrimination claims fail.

*5. Smith's Religious Discrimination Claim Fail For Additional Reasons*

In addition to Smith's failure to establish the essential elements of a prima facie case, Smith's count of religious discrimination fails for another key reason: the decision-maker had no knowledge about Mr. Smith's religion. "Title VII makes it unlawful to discharge or otherwise to discriminate against an individual because of that individual's religion." *EEOC v. Ilona of Hungary, Inc.*, 108 F.3d 1569, 1574 (7th Cir. 1997) (*citing* 42 U.S.C. § 2000e–2(a)(1)). Major D, the Administrator and the one who fired Smith, did not and does not know where Smith worships, if anywhere. He does not know to what church Smith belongs, if any. Without such information, Smith's case fails. "It is difficult to see how an employer can be charged with discrimination on the basis of an employee's religion when he doesn't know the employee's religion." *Reed v. The Great Lakes Companies, Inc.*, 330 F.3d 931, 934 (7th Cir. 2003) (holding the plaintiff who claimed he was fired for walking out of a meeting with his boss wherein the hotel employer was receiving free bibles from Gideon failed to establish a prima facie case of religious discrimination; the plaintiff refused to state what his religious beliefs were).

In fact, even if Major D had known Smith's religion, Smith admits that nothing about his own personal beliefs run contrary to The Salvation Army's. "In order to establish a prima facie case of religious discrimination, a plaintiff must show that the observance or practice conflicting with an employment requirement is religious in nature, that she called the religious observance or practice to her employer's attention, and that the religious observance or practice was the basis for her discharge or other discriminatory treatment." *Ilona of Hungary*, 108 F3d at 1575.

Because there is nothing to show that The Salvation Army knew about Smith's religious observance or practice, and because Smith's belief in a "higher power" does not conflict with The Salvation Army's employment requirement, his federal and local religious discrimination claims fail.

### E. Smith Cannot Rebut The Salvation Army's Legitimate, Non-Discriminatory Reasons For Its Actions

Even if Smith could establish a *prima facie* case, his discrimination claim should be dismissed because The Salvation Army had legitimate, non-discriminatory reasons for all of its employment actions regarding Smith.

The facts from multiple witnesses (except Smith, of course) describe Smith's increasingly unprofessional, negative, and disrespectful behavior, which triggered The Salvation Army's discipline. Then, on January 3, 2013, Smith became angry and loud; he used profanities and made threats; and his behavior continued when the ARC's Administrator, Major D, attempted to talk with him and calm him. But, Smith's tirade was insuppressible. Multiple individuals, including his supervisors, HR Coordinator, and Major D witnessed it and consistently described it. Regardless of religion, age, or disability, The Salvation Army need not tolerate such behavior by anyone, including Smith.

Thus, the undisputed, factual record, as a whole, shows that Smith's employment was properly terminated, and Smith's testimony to the contrary is insufficient to establish pretext. *Merheb v. Illinois State Toll Highway Auth.*, 2000 WL 198787 (N.D. Ill. Feb. 10, 2000) *aff'd*, 267 F.3d 710 (7th Cir. 2001) ("Merely casting doubt on an employer's stated reason for its employment decision is insufficient to establish pretext.") (*citing Weisbrot v. Med. Coll. of Wisconsin*, 79 F.3d 677, 682 (7th Cir. 1996)). The Court in *Merheb* addressed a similar situation. There, the plaintiff, who was terminated for engaging in threatening behavior, claimed the employer's proffered legitimate reason for the termination (which was affirmed by testimony of four witnesses) was pretext. The Court found that the plaintiff's "bare, unsupported, denials of his actions are insufficient to rebut the deposition testimony of four witnesses," and therefore he failed to meet his burden of demonstrate triable question of fact. *Id.* at *8 (*citing Rand*, 42 F.3d at 1146-47 (holding that conclusions and speculations are insufficient to defeat summary judgment)).

Similarly, in this case, Smith's bare, unsupported allegations include his accusations that Lightfoot "just didn't like him," that his performance was "great," that he was tested more than other employees, and that his supervisors asked him to sign a mystery evaluation that talked about his age, his religion and his disability. But those accusations, standing alone, are not enough to establish pretext. Faced with the multiple witness statements, documentation and witness testimony to the contrary, Smith's claims cannot survive the scrutiny of the summary judgment standard.

Because Smith cannot rebut The Salvation Army's legitimate non-discriminatory reasons for its actions, all of his claims fail.

## IV. SMITH'S HARASSMENT CLAIMS FAIL

Smith also claims he was harassed and explains that the harassment consisted of the drug tests and Lightfoot's "nasty attitude," which Smith admits was *in*discriminate. "To avoid summary judgment on a hostile work environment claim, a plaintiff must provide sufficient evidence to create a genuine issue of material fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [his age, religion, or disability] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014), cert. denied, No. 13-1540, 2014 WL 2891439 (U.S. Oct. 6, 2014). Smith cannot establish any of these elements.

Smith's allegations, even if taken as true, are not subjectively and objectively offensive, and further are not severe or pervasive. Smith was tested only twice for drugs—the second test occurring over one year before the first. These sporadic, isolated, and unrelated incidents, even if considered in light of the Lightfoot's alleged "nasty attitude," do not show Smith's workplace was "hellish" as required under the law. *Washington v. Am. Drug Stores, Inc*., 119 Fed Appx. 3, 6 (7th Cir. 2004) (holding handful of incidents that occurred over more than 13 months was not a hostile work environment) (*citing Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir.2002) (environment was not severe or pervasive where plaintiff's supervisors treated her rudely, ignored her suggestions, failed to communicate changes at work, and severely criticized her without good reason)).

Smith's harassment claims further fail because he does not allege the harassment was motivated by his age, religion, or his disability (including perceived drug use). Smith attributes the alleged harassment to Lightfoot not liking him, though he cannot explain why. Smith further acknowledges that Lightfoot had a "nasty attitude" with a lot of people, born from Lightfoot's

alleged arrogance. Because Smith has presented no evidence to show that that alleged harassment was based on Smith's protected status, his harassment claims fail. *See Patton*, 276 F.3d at 339.

Finally, Smith has not established a basis for employer liability. The Salvation Army had a complaint procedure in place to prevent and promptly correct any religious, disability, or age harassment. Smith was aware of this procedure, and he unreasonably failed to take advantage of it. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Because there is no basis for The Salvation Army's liability, Smith's harassment claims fail.

## V. CONCLUSION

For the foregoing reasons, The Salvation Army respectfully requests this Court grant summary judgment as to all of Smith's claims, and grant all other appropriate relief.

Respectfully submitted,

BARNES & THORNBURG LLP

/s/ Kyra E. Clark

Jeanine M. Gozdecki (16909-71)
Kyra E. Clark (28853-71)
700 1st Source Bank Center
100 North Michigan Street
South Bend, IN 46601-1632
Telephone: (574) 233-1171
Facsimile: (574) 237-1125
jeanine.gozdecki@btlaw.com
kyra.clark@btlaw.com

*Counsel for The Salvation Army*

## CERTIFICATE OF SERVICE

I hereby certify that on November 3, 2014, I electronically filed the foregoing *Defendant's Memorandum in Support of Motion for Summary Judgment* with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Kent Hull
Indiana Legal Services, Inc.
401 E. Colfax Avenue, Suite 116
South Bend, IN 46617

BARNES & THORNBURG LLP

/s/ Kyra E. Clark

SBDS01 404948v1